UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

KAREN KAZIK,

    Plaintiff,                                       Civil Action No.  13-10036

v.                                             HON. LAWRENCE P. ZATKOFF
                                                  U.S. District Judge
                                                  HON. R.  STEVEN WHALEN
COMMISSIONER OF SOCIAL         U.S. Magistrate Judge
SECURITY,

    Defendant.

_____/


## REPORT AND RECOMMENDATION

       Plaintiff Karen Kazik ("Plaintiff") brings this action under 42 U.S.C. §405(g) challenging a final decision of Defendant Commissioner denying her current application for Supplemental Security Income ("SSI") under the Social Security Act.  Both parties have filed summary judgment motions which have been referred for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B).  For the reasons set forth below, I recommend that Defendant's Motion for Summary Judgment be DENIED, and that Plaintiff's Motion for Summary Judgment  be GRANTED to the extent that the case be remanded for further administrative proceedings.


## PROCEDURAL HISTORY

        Plaintiff filed previous applications for DIB and SSI on April 17, 2006 and May 3, 2006 respectively, alleging disability as of October 15, 2002 (Tr. 14).  On January 21, 2009, Administrative Law Judge ("ALJ") Richard L. Sasena found Plaintiff not disabled (Tr. 14).

On October 21, 2009, the Appeals Council denied review (Tr. 14).

Plaintiff filed the present application for SSI on June 3, 2010, alleging disability as of October 1, 2003 (Tr. 14). After the initial denial of benefits, Plaintiff requested an administrative hearing, held August 3, 2011 in Detroit, Michigan (Tr. 29). ALJ Raymond D'Souza presided (Tr. 29). Plaintiff, represented by Steven Harthorn, testified (Tr. 33-53), as did Vocational Expert ("VE") Stephanee Leech (Tr. 53-58). On September 13, 2011, ALJ D'Souza found Plaintiff not disabled (Tr. 24). On November 30, 2012, the Appeals Council denied review (Tr. 1-4). Plaintiff filed for judicial review of the final decision on January 4, 2013.

## **BACKGROUND FACTS**

Plaintiff, born December 16, 1965, was 45 at the time of the ALJ's decision (Tr. 23-24). She completed high school (Tr. 183) and worked previously as a chauffeur, concession stand worker, and waitress (Tr. 183). She alleges disability due to a heart condition, a seizure disorder, a thyroid disorder, and depression (Tr. 182).

### A. Plaintiff's Testimony

*The ALJ prefaced Plaintiff's testimony by noting he was bound by res judicata from considering whether Plaintiff was disabled on or before January 21, 2009*, *the date of the previous administrative decision* (Tr. 32).

Plaintiff offered the following testimony:

Currently widowed, she lived in a Flatrock, Michigan apartment with a roommate (Tr. 34). She was able to read, write, and perform simple calculations (Tr. 34). She had not worked since holding a position as concession worker at an ice rink in 2002 (Tr. 34). Prior

to the concession job, she worked as a chauffeur and a waitress (Tr. 34, 36). She survived on food stamps and help from her roommate (Tr. 35).

In response to questioning by her attorney, Plaintiff testified that her heart condition had worsened due to lack of medication since being denied benefits in 2009 (Tr. 36). She noted that surgery recommended by her cardiologist for heart valve repair had been cancelled when her state sponsored medical insurance was cancelled (Tr. 36). She was "constantly exhausted" as a result of her heart condition, seizures, and the 2000 removal of a portion of her thyroid gland (Tr. 36). If deprived of her thyroid medicine for even one week, her body "shut[] down" (Tr. 37).

Plaintiff did not experience "grand mal" seizures, but rather, "mini mals" in which her vision was impaired and she was unable to communicate for up to two minutes (Tr. 38). The seizures were followed by "unbearable" headaches (Tr. 38). She experienced two seizures on the day of the hearing, but could not predict their frequency (Tr. 38). Medication lessened the severity of the seizures (Tr. 39). Due to seizure activity, her driver's license had been taken away (Tr. 39).

Plaintiff also experienced Raynaud's phenomenon, a blood circulation condition, which resulted in painfully cold feet (Tr. 40). She coped with the condition by wearing two pairs of hunting socks in the winter (Tr. 40). She also experienced ovarian cysts, but was unable to undergo a hysterectomy due to the potential interaction of hormone replacement therapy and her current medication (Tr. 41). She experienced GERD (Tr. 42). She sustained whiplash and lower back pain as a result of multiple car accidents, but the accidents occurred prior to the 2009 denial of benefits (Tr. 42). She experienced one episode of passing kidney stones (Tr. 43). She had been diagnosed with depression after her husband died in 2003 (Tr. 43-44). She took Paxil daily and on "bad days," a half dose of Xanax (Tr. 44). She had also

been diagnosed with Hodgkins Lymphoma but the condition had been in remission for 26 years (Tr. 40). The Paxil kept her "calm" (Tr. 44). She was able to access thyroid medication but was unable to afford seizure medication (Tr. 45). The combined use of Tylenol II, Xanax, and Paxil created drowsiness (Tr. 45). Her weight fluctuated 30 pounds upward when she was not taking seizure medication (Tr. 46).

On a typical day, she arose at 10 a.m., let her roommate's dog out, then took her own dog outside (Tr. 46). She performed "a little bit of house work," played on the computer for a short time, and then reclined (Tr. 46). She rarely watched television and was unable to use the computer for more than a few minutes due to eye strain (Tr. 46). On good days, she would take a walk, but did so "less and less" in recent times due to increasing fatigue (Tr. 46). She was able to cook simple dishes, but generally prepared meals with the help of her roommate (Tr. 47). Her roommate also performed the shopping chores, vacuumed, and carried laundry baskets (Tr. 47). On "bad days," she experienced level "twenty" on a scale of one to ten (Tr. 47). She experienced approximately seven "bad days" a month, coupled with pain-induced anxiety (Tr. 47-48). She was unable to perform gardening chores due to fatigue and pain (Tr. 48). She was unable to lift more than eight or nine pounds (Tr. 49). On a "bad day," she was unable to walk the parameter of a large building (Tr. 50). She was unable to sit for more than 15 minutes without changing position (Tr. 50). She had been prescribed a walker, wheel chair, and cane by her cardiologist (Tr. 51). She was unable to afford medicine for all of her conditions (Tr. 52).

**B.     Medical Evidence**

**1.  Treating Sources[1]**

In July, 2005, Plaintiff declined to undergo recommended back surgery (Tr. 317). June, 2006 cardiological records note the presence of tachycardia, suggesting investigation of "non-cardiac factors such as hyperthyroidism . . ." (Tr. 292). In May, 2007, cardiologist Michael R. Denike, D.O. noted that Plaintiff had reduced her cigarette intake from two packs to one-quarter pack a day (Tr. 351). A July, 2007 echocardiogram showed an ejection fraction of "45-50" percent indicative of "significant mitral valve disease" (Tr. 314). In May, 2008, Dr. Denike reported that symptoms of Raynaud's phenomenon had improved since beginning a new medication (Tr. 340).

In May, 2009, cardiologist Kevin J. Berlin, D.O. noted that Plaintiff felt "relatively well from a cardiovascular viewpoint" (Tr. 334). Dr. Berlin noted that Plaintiff continued to smoke "one pack every five days" (Tr. 334). He noted the presence of "severe mitral regurgitation" and "moderate aortic insufficiency" (Tr. 334). In November, 2009, Plaintiff reported to Dr. Berlin that she was "feeling well" (Tr. 328). Treating records by Leila Haddad, M.D. from January to March, 2010 include imaging studies of the pelvic region showing cysts on both ovaries (Tr. 236, 279). April, 2010 treating records by Nancy Juopperi, D.O. state that Plaintiff experienced up to 50 petit mal seizures in one day, characterized by an inability to communicate and pain above the eyes, and severe headaches (Tr. 239). Dr. Juopperi noted Plaintiff's report of head injuries at the age of 17 and in a more recent motor vehicle accident (Tr. 239, 252). Plaintiff demonstrated decreased sensation in the lower extremities with 4/5 strength on the right and 3/5 on the left (Tr. 240).

---

[1] Records predating the January 21, 2009 administrative decision are included for comparison purposes only.

She exhibited an antalgic gait (Tr. 240). Dr. Juopperi attributed Plaintiff's symptoms to either cerebral or spinal cord dysfunction (Tr. 240). An MRI from the next month showed "chronic posttraumatic changes or chronic ischemic changes" but no "acute" abnormalities (Tr. 242, 262). June, 2010 treating notes state that Plaintiff had experienced depression as a result of a change in anti-epileptic medication (Tr. 244). The same month, Dr. Haddad re-prescribed Xanax (Tr. 263).

August, 2010 cardiological treating records note a diagnosis of "severe mitral regurgitation secondary to mitral valve prolapse, hypothyroidism, optical seizures, and chronic tobacco use (Tr. 280). Plaintiff reported recent ankle edema (Tr. 280). An echocardiogram showed an ejection fraction of 49 percent (Tr. 281). Plaintiff's left ventricle functioning was decreased from November, 2009 levels (Tr. 326). Kevin J. Berlin, D.O. recommended a cardiac catheterization, but noted that Plaintiff was unable to undergo the procedure due to insurance problems (Tr. 282). Dr. Haddad's January, 2011 treating records note the presence of foot discoloration as a result of "severe Raynaud's [phenomenon]" (Tr. 285).

In May, 2011, Plaintiff sought emergency treatment for stomach ulcers (Tr. 368-380). She was prescribed Carafate and discharged the following day in stable condition (Tr. 376). In August, 2011, Dr. Haddad completed a Physical Residual Functional Capacity Questionnaire, stating that Plaintiff experienced chronic pain, depression, seizures, hematuria, ulcers, and Raynaud's phenomenon (Tr. 362). She gave Plaintiff a poor prognosis, noting a positive straight leg test and a "long history of pain management" (Tr. 362). She noted the diagnoses of depression and anxiety, opining that physical and psychological symptoms would interfere "constantly" with Plaintiff's work abilities (Tr. 363). She found that Plaintiff was unable to sit for more than 15 minutes or stand for more

than 10 at a time, adding that Plaintiff was unable to sit or stand for more than two hour in an eight-hour work day (Tr. 363-364). She found that Plaintiff required the option of changing positions at certain intervals and required unscheduled breaks "very frequently" (Tr. 364). She found that Plaintiff required the use of a cane and that lifting restrictions would preclude all competitive employment (Tr. 364).

### 2. Consultative and Non-Examining Sources

In September, 2010, Jai K. Prasad, M.D. performed a consultative physical examination of Plaintiff on behalf of the SSA (Tr. 265-271). Plaintiff reported prolapsed discs at L3-L4, L4-L5 resulting in back pain radiating into her left lower extremity (Tr. 265). She stated that she experienced a petit mal seizure earlier the same day (Tr. 266). She stated that the frequency of her seizures was increasing (Tr. 266). She also reported shortness of breath on exertion as a result of a "leaky" heart valve (Tr. 266). She admitted to smoking "five to six" cigarettes a day" (Tr. 266). She exhibited normal upper extremity strength and a normal gait (Tr. 267-268).

Dr. Prasad found that Plaintiff required "further treatment" for back pain (Tr. 268). He noted that Plaintiff was depressed (Tr. 268). He recommended that Plaintiff "see a psychiatrist or psychologist to quantify her mental depression . . ." (Tr. 268). He recommended therapy for her back and medication to control seizures (Tr. 268).

The same month, Hugh D. Bray, Ph.D. performed a consultative psychological assessment of Plaintiff, noting her report of depression since her husband's 2003 death (Tr. 272). Plaintiff stated that she saw a counselor in 2003 who told her she did not require treatment (Tr. 273). She reported good relationships with her supervisors and coworkers while working (Tr. 273).

Dr. Bray observed an abnormal gait and "unsteady" balance (Tr. 274). Plaintiff

exhibited "diminished" self esteem (Tr. 274). He found that she did not exaggerate or minimize her symptomology (Tr. 275). He assigned her a GAF of 55 with a "guarded" prognosis (Tr. 276).

### C. Vocational Expert Testimony

Citing the Dictionary of Occupational Titles ("DOT"), VE Leech classified Plaintiff's former job as a chauffeur as semiskilled and exertionally medium[2] (light as described by Plaintiff); concession worker, unskilled/light; and waitress, semiskilled/light (Tr. 55).

The ALJ then posed the following hypothetical question, taking into account Plaintiff's age, education, and work background:

> [A]ssume a person . . . who is able to do sedentary work with no climbing of ladders, ropes or scaffolds; occasional climbing of ramps or stairs; occasional balancing, stooping, crouching, kneeling and crawling; must avoid all use of hazardous machinery and all exposure to unprotected heights; work is also limited to simple as defined in the DOT as [Specific Vocational Preparation ("SVP")] levels 1 and 2,[3] routine and repetitive tasks, in a low stress environment with only occasional decision-making, only occasional changes in the work setting, with no strict reduction quota with an emphasis on a per shift basis rather than a per hour basis. Could that person perform their past work? (Tr. 56).

---

[2]
  20 C.F.R. § 404.1567(a-d) defines *sedentary* work as "lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools; *light* work as "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds;" *medium* work as "lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds;" and that exertionally *heavy* work "involves lifting no more than 100 pounds at a time with frequent lifting or carrying of objects weighing up to 50 pounds.

[3]
  SVP measures the "amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation."DOT, Appendix C, http://www.occupationalinfo.org/appendxc_1.html#II (last visited on January 30, 2014). A job with an SVP rating of one pertains to jobs that can be performed after "short demonstration only. *Id.* A job with an SVP rating of two corresponds to a job that a typical worker can perform after "anything beyond short demonstration up to and including 1 month." *Id.* An SVP of 1 or 2 refers to unskilled work. SSR 00-04p.

The VE responded that the hypothetical individual could perform the unskilled, sedentary work of a bench assembler (1,800 positions in the regional economy); office clerk (2,800); packer (1,000); information clerk (2,000); and inspector (1,000) (Tr. 56). The VE testified further that if the hypothetical individual needed to avoid all temperature extremes; were limited to frequent (as opposed to constant) "near acuity and far acuity;" or, required the use of a hand-held assistive device for ambulation for uneven terrain or "prolonged ambulation," the job findings would remain unchanged (Tr. 57). The VE testified however that the need for three or more unscheduled absences a month, or, the need to be "off task" for more than 20 percent of the workday would preclude work at all exertional levels (Tr. 57). The VE concluded by stating that her testimony was consistent with the information found in the DOT and its companion publications (Tr. 58).

### D. The ALJ's Decision

Citing *Drummond v. Commissioner of Social Security,* 126 F.3d 837 (6th Cir. 1997), ALJ D'Souza found the absence of ""new and material evidence concerning [Plaintiff's] condition" since the January 21, 2009 determination (Tr. 17). As to exertional limitations, the ALJ noted that Plaintiff alleged a lesser degree of limitation in lifting, sitting, standing, and walking than in the earlier claim (Tr. 17). He noted that Plaintiff was currently unable to drive, but that the license had been revoked because of visual, rather than exertional limitations (Tr. 18). As to allegations of seizures, the ALJ acknowledged that a May, 2010 MRI of the brain suggested some degree of abnormality, but stated that "there is no evidence to suggest that the ischemic changes are of recent onset" (Tr. 18-19). He noted that despite the MRI results, Plaintiff's seizure treatment remained unchanged (Tr. 19). He also noted

that recent electrocardiogram tests established that Plaintiff's mitral valve prolapse condition had not worsened (Tr. 19). He found that Plaintiff's depressive symptoms were attributable to her husband's death (Tr. 20).

Citing the medical records, ALJ D'Souza found that Plaintiff experienced the severe impairments of lumbar radiculopathy, Raynaud's phenomenon, history of seizures, history of migraine headaches, gout, major depressive disorder, mitral valve disease, and peripheral and vascular disease, but that none of the conditions met or medically equaled impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (Tr. 22). The ALJ found that Plaintiff possessed the Residual Functional Capacity ("RFC") for sedentary work with the following additional limitations:

> [T]he claimant can never climb ladders. The claimant can occasionally climb ramps and stairs, and can occasionally balance, stoop, kneel, crouch, and crawl. The claimant cannot work at unprotected heights or around moving machinery. Mentally, the claimant is restricted to the performance of simple, routine, repetitive tasks. Such tasks must require little judgment and must be able to be learned in a short period (Tr. 22).

Citing the VE's findings the ALJ found that Plaintiff could work as a bench assembler, office clerk, packer, receptionist/information clerk, and inspector (Tr. 23).

The ALJ discounted Plaintiff's allegations of limitation, noting that her testimony that she experienced level "twenty" pain on a scale of one to ten was undermined by the lack of discomfort observed at the hearing and the absence of records showing emergency room visits (Tr. 19). He found that Plaintiff's "exaggerated and inconsistent statements" stood at odds with the medical evidence (Tr. 20). He also found that Plaintiff's continued use of tobacco was "doubly harmful to [her] case because . . . it is unhealthy behavior that likely has contributed to [her] impairments and symptoms" (Tr. 19).

## STANDARD OF REVIEW

The district court reviews the final decision of the Commissioner to determine whether it is supported by substantial evidence. 42 U.S.C. §405(g); *Sherrill v. Secretary of Health and Human Services,* 757 F.2d 803, 804 (6th Cir. 1985). Substantial evidence is more than a scintilla but less that a preponderance. It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) (*quoting Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229, S. Ct. 206, 83 L.Ed.126 (1938)). The standard of review is deferential and "presupposes that there is a 'zone of choice' within which decision makers can go either way, without interference from the courts." *Mullen v. Bowen,* 800 F.2d 535, 545 (6th Cir. 1986)(en banc). In determining whether the evidence is substantial, the court must "take into account whatever in the record fairly detracts from its weight." *Wages v. Secretary of Health & Human Services*, 755 F.2d 495, 497 (6th Cir. 1985). The court must examine the administrative record as a whole, and may look to any evidence in the record, regardless of whether it has been cited by the ALJ. *Walker v. Secretary of Health and Human Services*, 884 F.2d 241, 245 (6th Cir. 1989).

## FRAMEWORK FOR DISABILITY DETERMINATIONS

Disability is defined in the Social Security Act as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A). In evaluating whether a claimant is disabled, the Commissioner is to consider, in sequence, whether the claimant: 1) worked during the alleged period of disability; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of an impairment

listed in the regulations; 4) can return to past relevant work; and 5) if not, whether he or she can perform other work in the national economy. 20 C.F.R. §416.920(a). The Plaintiff has the burden of proof as steps one through four, but the burden shifts to the Commissioner at step five to demonstrate that, "notwithstanding the claimant's impairment, he retains the residual functional capacity to perform specific jobs existing in the national economy." *Richardson v. Secretary of Health & Human Services,* 735 F.2d 962, 964 (6th Cir.1984).

## ANALYSIS

Plaintiff makes several arguments in favor of remand. First, she contends that the ALJ misapplied Administrative Ruling ("AR") 98-4(6) in finding that her condition had not materially worsened since the previous disability decision of January 21, 2009. *Plaintiff's Brief* at 10-14, *Docket #12*. She argues second that the ALJ erred by discounting treating physician Dr. Haddad's August, 2011 assessment. *Id.* at 14-15(citing Tr. 362-364). Third, she disputes the ALJ's finding that her testimony was inconsistent with the medical evidence, arguing that the credibility determination was not supported by substantial evidence. *Id.* at 15-17. Last, she notes that while the ALJ adopted the January 21, 2009 administrative findings, the earlier decision is not contained in the current transcript. *Id.* at 18.

Plaintiff's first and fourth arguments, both relating to the application of AR 98-4(6), will be addressed first, followed by the "treating physician" and credibility arguments.

### A. ALJ D'Souza's Reliance on the January 21, 2009 Determination

As stated in his September 13, 2011 opinion, ALJ D'Souza performed his analysis pursuant to *Drummond v. Commissioner of Social Security,* 126 F.3d 837 (6th Cir. 1997), which states that in the absence of new and material evidence postdating an earlier decision under the same Title, the later fact finder must adopt the previous RFC. Administrative Ruling ("AR") 98-4, codifying *Drummond,* provides as follows:

> When adjudicating a subsequent disability claim with an unadjudicated period arising under the same title of the Act as the prior claim, adjudicators must adopt such a finding from the final decision by an ALJ or the Appeals Council on the prior claim in determining whether the claimant is disabled with respect to the unadjudicated period unless there is new and material evidence relating to such a finding or there has been a change in law, regulations, or rulings affecting the finding or method for arriving at the finding. AR 98-4(6).

In order to be awarded benefits for his or her condition subsequent to the original finding of non-disability, a claimant "must demonstrate that her condition has so worsened . . . that she was unable to perform substantial gainful activity." *Priest v. Social Security Admin*, 3 Fed.Appx. 275, 276, 2001 WL 92121, *1 (6th Cir. January 26, 2001)(citing *Casey v. Sec'y of Health and Human Servs.,* 987 F.2d 1230, 1232-33 (6th Cir.1993)).

Citing *Drummond,* ALJ D'Sousa stated the he "adopt[ed] the relevant findings of the prior administrative law judge decision concerning the claimant's severe impairments, whether these impairments meet, equal, or medically equal the respective listings, and concerning her residual functional capacity" (Tr. 21).

The present transcript does not contain the adopted January 21, 2009 decision or the hearing transcript containing Plaintiff's prior testimony. The Court is thus unable to review the evidence relied upon by ALJ D'Souza in finding that Plaintiff's condition had not materially worsened since the prior decision. ALJ D'Souza supported his conclusions by noting that Plaintiff's testimony that she could lift up to eight or nine pounds exceeded her claim at the prior hearing that she could lift only five (Tr. 17). However, the Court is unable to evaluate this finding without access to the original hearing transcript.

ALJ D'Souza's adoption of ALJ Sasena's findings as to Plaintiff's physical conditions are additionally problematic (Tr. 18-20). While ALJ D'Souza noted that ALJ Sasena rejected claims of limitation as a result of petit mal seizures based on negative EEG exams, the newer evidence includes MRI studies consistent with seizure activity. The Court does not have

benefit of ALJ Sasena's rationale for rejecting the claims of disabling seizures and cannot determine whether the claims were discounted purely on the lack of objective evidence or for a combination of reasons. For the same reasons, the Court is unable to accept ALJ D'Souza's reasons for adopting some of Plaintiff's claims of limitation and rejecting others.

Defendant's argument that Plaintiff waived the argument concerning the missing decision by failing to raise the issue at the administrative hearing is not well taken. *Defendant's Brief* at 17-18, *Docket #14.* While Plaintiff's counsel stated that he had reviewed the "available records" and that all of the pertinent evidence was included in the transcript, he was clearly referring to medical rather than procedural evidence (Tr. 32-33). In any event, this Court cannot perform a meaningful review of the current decision without access to the previous one.

### B. The Treating Physician Analysis

Plaintiff also faults ALJ D'Souza for giving "little weight" to Dr. Haddad's August, 2011 assessment of Plaintiff's work related abilities. *Plaintiff's Brief* at 19-20 (citing Tr. 21, 362-364). Contrary to the ALJ's findings, Plaintiff argues that the medical records strongly support Dr. Haddad's conclusions.

An opinion of limitation or disability by a treating source is entitled to deference. "[I]f the opinion of the claimant's treating physician is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record, it must be given controlling weight."*Hensley v. Astrue, 573* F. 3d 263, 266 (6th Cir. 2009)(internal quotation marks omitted)(*citing Wilson v. Commissioner of Social Sec.* 378 F.3d 541, 544 (6th Cir. 2004). Further,

> [i]f the opinion of a treating source is not accorded controlling weight, an ALJ must apply certain factors--namely, the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the

   record as a whole, and the specialization of the treating source--in determining
   what weight to give the opinion.

*Wilson,* at 544 (citing 20 C.F.R. 404.1527(c)(2-6)).

  The failure to provide "good reasons" for rejecting a treating physician's opinion constitutes reversible error. *Gayheart v. Commisioner of Social Security,* 710 F. 3d 365, 376 (6th Cir. 2013)(citing *Wilson,* at 544-446). "[T]he Commissioner imposes on its decision-makers a clear duty to 'always give good reasons in our notice of determination or decision for the weight we give [a] treating source's opinion.'" *Cole v. Astrue* 661 F.3d 931, 937 (6th Cir.2011); § 404.1527(c)(2). "These reasons must be 'supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.'" *Gayheart,* at 376 (citing SSR 96-2p, 1996 WL 374188, *5 (1996)).

  The ALJ rejected Dr. Haddad's August, 2011 opinion that Plaintiff was unable to sit, stand, or walk for more than two hours in an eight-hour workday on the basis that the medical transcript did not support the alleged degree of physical limitation (Tr. 21, 362-364). He noted that Dr. Haddad's finding that Plaintiff was unable to sit for more than 15 minutes at a time stood at odds with Plaintiff's ability to sit through a half-hour "plus" administrative hearing (Tr. 21). He noted that the issue of disability was reserved to the Commissioner pursuant to 20 C.F.R. 416.927(e)(1).

  Nonetheless, Dr. Haddad's fairly extensive findings cannot be dismissed so easily (Tr. 21). For example, her finding that Plaintiff would be unable to stand for significant periods is supported by her own January, 2011 observations of foot discoloration due to "severe" Raynaud's syndrome (Tr. 285). While the ALJ was entitled to credit his own observations in making the credibility determination, Plaintiff's ability to sit through a half-hour hearing on one occasion is not "smoking gun" evidence that she could sit for up six hours a day as

required to perform sedentary work (Tr. 22). While he purportedly gave "significant weight" to Dr. Bray's findings as to Plaintiff's psychological condition (Tr. 20), Dr. Bray's finding that Plaintiff did not exaggerate her symptomology and exhibited an abnormal gait and "unsteady" balance actually reflect Dr. Haddad's findings (Tr. 274-275, 362-364). As discussed further below, the MRIs showing abnormal brain activity (Tr. 242), coupled with Dr. Juopperi 's observations of an antalgic gait and decreased strength and sensation in the lower extremities, constitutes objective evidence supporting Dr. Haddad's conclusion that Plaintiff experienced disabling neurological limitations (Tr. 240). June, 2010 treating notes stating that Plaintiff's anti-epileptic medication was changed after Dr. Juopperi's examination and review of the MRI study also support Dr. Haddad's finding that seizures created significant, if not disabling symptomology. While the ALJ also found that Plaintiff was "prone to exaggeration and inconsistency," (Tr. 21) the credibility determination itself, as discussed below, is weakly supported. Because he did not provide "good reasons" for discounting Dr. Haddad's assessment, a remand on this basis is warranted.

### C. The Credibility Determination

In discounting Plaintiff's allegations of limitation, ALJ D'Souza found that her claims were "neither consistent nor any greater scope than the allegations before Judge Sasena at the prior hearing on August 18, 2008" (Tr. 17).

The credibility determination, guided by SSR 96-7p, describes a two-step process for evaluating symptoms. "First, the adjudicator must consider whether there is an underlying medically determinable physical or mental impairment. . .that can be shown by medically acceptable clinical and laboratory diagnostic techniques." 1996 WL 374186, *2. The second prong of SSR 96-7p directs that whenever a claimant's allegations regarding "the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated

by objective medical evidence," the testimony must be evaluated "based on a consideration of the entire case record."*Id.* [4]

The ALJ's credibility determination provides additional grounds for remand. First, his reliance on the missing administrative decision precludes meaningful review of the rejection of Plaintiff's claims. The ALJ stated that Plaintiff's condition has not worsened since the earlier decision because she testified to greater exertional abilities at the most recent hearing than at the previous one (Tr. 17). Without access to the earlier decision, review of the determination is impossible.

Second, even assuming that the ALJ had not been bound by the previous findings, his rationale for rejecting Plaintiff's claims is not well supported,. His citation to a test showing "negative straight leg raise" at a consultative examination (Tr. 18) is contradicted by treating physician's statement that the test yielded a positive result (Tr. 362). The ALJ's rejection of Plaintiff's allegations of multiple petit mal seizures on a daily basis is independently problematic. In support of his finding that Plaintiff was capable of working, he noted that her driver's license was taken away "for visual impairment reasons, not because she is otherwise physically incapable of driving" (Tr. 18). However, the revocation of her license as a result of worsening seizure activity, supports, rather than detracts from the disability

---

[4]In addition to an analysis of the medical evidence, C.F.R. 404.1529(c)(3) lists the factors to be considered in making a credibility determination:

> (i) Your daily activities; (ii) The location, duration, frequency, and intensity of your pain or other symptoms; (iii) Precipitating and aggravating factors; (iv) The type, dosage, effectiveness, and side effects of any medication you take or have taken to alleviate your pain or other symptoms; (v) treatment, other than medication, you receive or have received for relief of your pain or other symptoms; (vi) Any measures you use or have used to relieve your pain or other symptoms ... and (vii) Other factors concerning your functional limitations and restrictions due to pain or other symptoms."

claim (Tr. 39).

The ALJ discounted the significance of a May, 2010 MRI of the brain showing "posttraumatic changes," (Tr. 18, 242), stating that "there is no evidence to suggest that the . . . changes are of recent onset, especially given that the claimant alleges experiencing these seizure episodes for the last twenty plus years" (Tr. 18-19). In fact, the MRI strongly supports Plaintiff's claims of both longstanding and worsening seizure activity.[5] Dr. Juopperi's treating notes from June, 2010 indicate that Plaintiff's anti-seizure medication was changed after the MRI results were made available (Tr. 244). The ALJ's speculative determination that "the MRI findings . . . cannot reasonably be considered recent changes," (Tr. 19) stands at odds with the fairly recent revocation of Plaintiff's driver's license for vision problems created by the seizures, Dr. Juopperi's clinical findings, and the June, 2010 medication change.

While the ALJ discounted Plaintiff's claims of fatigue by citing studies showing that her heart valve condition had not deteriorated, he did not address her claims that she also experienced fatigue because of difficulty regulating her thyroid condition (Tr. 36-37). While the ALJ noted that recent echocardiograms showed that Plaintiff's valve condition had not worsened significantly since January, 2009 (Tr. 20), the record shows that her cardiologist recommended a cardiac catheterization in August, 2010[6] (Tr. 282). Although the ALJ was entitled to finding that the continued use of tobacco undermined the claims of heart problems (Tr. 19), the record shows that Plaintiff made significant efforts in this regard by cutting her tobacco use tenfold from two packs to one fifth of a pack each day (Tr. 334,

---

[5]The May, 2010 imaging studies were apparently the first time Plaintiff was able to undergo an MRI.

[6] Financial problems prevented Plaintiff from undergoing the procedure (Tr. 282).

351). Finally, although the ALJ repeatedly discounted Plaintiff's claims on the basis that she testified to level "twenty" pain on a scale of one to ten (Tr. 18, 21, 47), a plain reading of the hearing transcript suggests that Plaintiff was simply using colloquial language to communicate that her pain was "very bad" on "bad" days (Tr. 47).

The absence of the earlier decision from the transcript, along with the other issues discussed above, mandates remand. The record before this Court shows a very strong but perhaps not "overwhelming" case for benefits. *Faucher v. Secretary of Health and Human Services,* 17 F.3d 171, 176 (6th Cir.1994). As such, a remand for further fact-finding, rather than an award of benefits is appropriate. Upon remand, I recommend that the record be amended to include the prior decision, and that there be further development of the treating physician analysis and credibility determination.

### CONCLUSION

For the reasons stated above, I recommend that Defendant's Motion for Summary Judgment be DENIED, and that Plaintiff's Motion for Summary Judgment be GRANTED to the extent that the case be remanded for further administrative proceedings consistent with this Report.

Any objections to this Report and Recommendation must be filed within 14 days of service of a copy hereof as provided for in 28 U.S.C. §636(b)(1) and E.D. Mich. LR 72.1(d)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Howard v. Secretary of HHS,* 932 F.2d 505 (6th Cir. 1991); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981). Filing of objections which raise some issues but fail to raise others with specificity will not preserve all the objections a party might have to this Report and Recommendation. *Willis v. Secretary of HHS,* 931 F.2d 390, 401 (6th Cir. 1991); *Smith v.*

*Detroit Fed'n of Teachers Local 231,* 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within 14 days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall be not more than 20 pages in length unless by motion and order such page limit is extended by the court. The response shall address specifically, and in the same order raised, each issue contained within the objections.

Dated: February 4, 2014                s/ R. Steven Whalen
                                        R. STEVEN WHALEN
                                        UNITED STATES MAGISTRATE JUDGE

I hereby certify that a copy of the foregoing document was sent to parties of record on February 4, 2014, electronically and/or by U.S. mail.

                                        s/Michael Williams
                                        Case Manager for the
                                        Honorable R. Steven Whalen